# Jones *against* Murphy.

Will made 16th April 1837: the defendants alleged another will made about the 17th June 1837, different in its dispositions, revoking former wills, and that it was destroyed or suppressed by fraud.

*Held*, 1. That if such destruction or suppression is shown expressly or by circumstances, and that the dispositions of the second will are inconsistent with those of the first, it amounts to a revocation.

2. When the second will cannot be found, and the question is what became of it, the first presumption is that it was in the possession of the testator, and that he cancelled it; but if it was in the possession practically of the wife or executor whose interests are adverse to it, proof ought to be given on the subject, and the absence of proof is an argument against the presumption.

3. In case of spoliation or fraud in respect to the second will, it is not necessary to show its contents, or in what respect it revoked the first, as must be done in ordinary cases.

ERROR to the Common Pleas of *Philadelphia* County.

This was a feigned issue to try the validity of a certain instrument of writing dated 16th April 1837, purporting to be the last will and testament of Peter Shade deceased, in which Daniel R. Murphy and James Green, executors of the estate of Peter Shade deceased, were plaintiffs, and Thomas Jones and Maria his wife, daughter and heiress of said Peter Shade, defendants.

The instrument in question was as follows:

I, Peter Shade, of the county of Philadelphia, gentleman, do make and publish this as my last will and testament in manner and form following, that is to say, in the first place I direct my executors, Daniel R. Murphy and James Green, to pay and satisfy all my just debts and funeral expenses as soon after my death as can conveniently be done, out of the rents, issues and profits of my real estate; and the better to enable my said executors to pay and satisfy my said debts and funeral expenses, I do give and devise to them, the said Daniel R. Murphy and James Green, and the survivor of them, and the executors of such survivor, all my lands, tenements and hereditaments for the space of one year, (my house in Almond street, No. 41, excepted,) to keep the same in

repair, and out of the rents, issues and profits thereof to pay and satisfy my said debts and funeral expenses, and after the payment of my said debts and funeral expenses, to pay to Elizabeth Green out of the said rents, issues and profits of my real estate the sum of $500 for her sole and separate use and without any interference of her present husband, James Green, or any future husband, and her receipt shall be sufficient discharge for the said sum of $500 to my said executors; and in case any surplus shall remain of the said rents, issues and profits of my real estate in the hands of my executors after the payment of my debts and funeral expenses and the legacy of $500 to the said Elizabeth Green, my step-daughter, I give and bequeath unto my said wife, Hannah Shade, the said surplus. Item, I do give and bequeath unto my said wife all my moveable property at Francisville, to be disposed at public sale as soon as conveniently can be done. Item, I do give and devise unto my said wife my house situated on the north side of Almond street, No. 41, with all the furniture therein, to have and to hold the same for the term of her natural life and no longer, she to keep the said house in repair and to pay all taxes on the same; but in case my said wife shall marry, then this said devise shall cease. Item, I do give and bequeath the interests and dividends due and to grow due on my bank stocks to my executors in trust to pay the same over from time to time to my said wife for and during the term of her natural life; but in case my said wife shall marry after my death, then this bequest shall cease. Item, I do give and bequeath unto the said Elizabeth Green all that certain two story brick messuage or tenement situated on the west side of Delaware Seventh street, in the county of Philadelphia and next to the corner of Baker street, to have and to hold the said messuage or tenement and lot or piece of ground thereunto belonging unto the said Elizabeth Green for and during the term of her natural life and no longer, and without any control or interference of her present or any future husband, and for her sole and separate use. Item, I do give and devise and bequeath to my friend, Joseph S. Riley, his heirs, executors, administrators and assigns, in trust nevertheless for the only proper use and behoof of my grandson, John V. Shade, and my granddaughter, Elizabeth Shade, all that certain brick house situated in North Front street, No. 2, now occupied by John G. Martin, together with that brick and frame messuage or tenement situated in Biddle's Alley, share and share alike, as tenants in common and not as joint tenants, the rents to be collected quarterly and be deposited in the Savings Fund, the interest to be added to the principal, and the share of each to be paid as he or she may arrive at the age of 22 years: in case the death of one of them previous to the age of 22 years, the survivor shall be entitled to that portion bequeathed to both, but should they die without issue, then my heirs hereby named, that is, Susanna Ferguson, Margaretta Myers and Elizabeth Lenahan, shall inherit their estate.

[Jones v. Murphy.

And all the rest of my real estate (being all my real estate after the payment of my debts and funeral expenses, and the satisfaction of estates for life devised to my stepdaughter Elizabeth and my wife Hannah, and my personal estate with the exception of the furniture and moveables hereinbefore bequeathed to my said wife, and the interest and dividends of my bank stocks bequeathed to my executors during the life of my said wife and for her use, together with that portion hereinbefore mentioned, which I have bequeathed to my grandson, John V. Shade, and my granddaughter, Elizabeth Shade), whatsoever and wheresoever in possession or reversion or remainder, or to which I now am, or at the time of my death may be entitled to, I do direct to be divided into three equal parts. One-third part of which said residue I give, devise and bequeath to my daughter, Susanna Ferguson, her heirs, executors, administrators and assigns for ever, for her sole and separate use, and without any control or interference of her present or any future husband. And one other equal third part of the said residue of my estate I do give, devise and bequeath to my granddaughter, Elizabeth Lenahan, her heirs, executors, administrators and assigns for ever. And one equal third part of the said residue of my real estate I do give, devise and bequeath to my daughter, Margaretta Meyers, her heirs, executors, administrators and assigns for ever, for her sole and separate use, and without the control of her present or any future husband. I do acknowledge that I owe John Pizzant the sum of $400, which shall be paid out of that part of my estate bequeathed to my heirs, as follows : Susanna Ferguson to pay $100, Margaretta Meyers to pay $100, Elizabeth Lenahan to pay $100, John V. Shade to pay $50, Elizabeth Shade to pay $50, making in all $400. And should any interest be demanded for the said $400 which I owe to John Pizzant, it shall be paid by his mother Susanna Ferguson.

Item, I do give and bequeath to my granddaughter Susan Meyers a gold watch, which is marked S. S., together with gold chain and trinkets belonging to the same, which watch and trinkets and chain complete, I loaned to Susanna Ferguson.

Item, I consider that Maria Jones has had her full share of my said estate in moneys improperly taken, moneys loaned and property improperly taken.

Item, I do give, devise and bequeath to the children of Maria Jones, to be paid to them when they arrive at the age of 22 years, the sum of $200 each, which sum shall be paid to them out of that portion of my estate which I have bequeathed to heirs, that is to say, Susanna Ferguson to pay to each child, when he or she shall arrive at the age of 22 years, $50. Also, Elizabeth Lenahan to pay to each child, when he or she shall arrive at the age of 22 years, the sum of $50. Also, Margaretta Meyers to pay to each child, when he or she shall arrive at the age of 22 years, the sum of $50. Also, John V. Shade and Elizabeth Shade to pay to each

child, when he or she shall arrive at the age of 22 years, the sum of $25 each, making the sum to each child amount to $200.

Item, I authorize Daniel R. Murphy to sell, or cause to be sold, all my moveable belonging to me at Francisville, and satisfy all my just debts, as far as may be due at my decease, and the balance of moneys collected shall be deposited in the Savings Fund Bank, for the benefit of my wife.

Item, I authorize Daniel R. Murphy, one year after my death, to draw all moneys on deposit belonging to me in bank therefrom, and deposit the same in the Saving Fund Bank, to the credit of my wife. Item, I do give and bequeath to Daniel R. Murphy that piece of furniture called a secretary, which he shall receive at any time his mother, my wife, may feel disposed so to do. Also, I do give and bequeath all the furniture in my house in Almond street, at the decease of my wife, together with such moneys remaining in the Savings Fund at the death of my wife. And, lastly, I do appoint my friends, Daniel R. Murphy and James Green, to be the executors of this my last will and testament. In witness *wereof* I have hereunto set my hand and seal, declaring this and this only to be my last will and testament, and I hereby revoke and annul all any other will by me at any time. This 16th day of April, in the year of our Lord 1837. Item, I wish to be understood that my grandchildren, John V. Shade and Elizabeth Shade, shall inherit one equal fourth of my estate at the death of my wife; that will be a second division.

PETER SHADE. [SEAL.]

Signed, sealed, and published, and declared by the testator, and as for his last will and testament, in our presence, who, at the request of the said testator, and in his presence, have subscribed our names as witnesses.

JOSEPH KLAPP,<br>JOHN V. TITTERMARY.

Commonwealth of Pennsylvania, } ss.
City and County of Philadelphia. }

Register's Office, August 15, 1837.

Then personally came John V. Tittermary, the subscribing witness to the aforegoing instrument of writing, the last will and testament of Peter Shade, deceased, therein mentioned, and on his solemn oath did depose, declare and say, that he was personally present, and did see and hear the said Peter Shade, the testator therein named, and whose name is thereto subscribed, sign, and publish, and declare the said instrument of writing to be as and for his last will and testament, and at the doing thereof he, the said testator, was of sound, disposing mind, memory and understanding, to the best of his knowledge and belief. And that he

[Jones v. Murphy.]

did subscribe his name thereto as witness, at the request of the said testator, and in his presence.

JOHN V. TITTERMARY.

Sworn and subscribed before me,

JOHN GEST,. Register.

Commonwealth of Pennsylvania, ⎱ ss.
City and County of Philadelphia. ⎰

Register's Office, August 15, 1837.

Then personally came Dr Joseph Klapp, one of the witnesses to the aforegoing instrument of writing, the last will and testament of Peter Shade, deceased, and hesitated to testify to the aforegoing written deposition; but on his solemn oath did depose, declare and say:—That Peter Shade, the testator, did put his finger on the seal thereof, and said he acknowledged the seal to be his seal, and his name (written) to be his signature, and that the said paper writing was his last will and testament; and at the doing thereof he, the said testator, was of sound, disposing mind, memory and understanding, to the best of his knowledge and belief, and that he did subscribe his name as a witness thereto.

JOSEPH KLAPP.

Sworn and subscribed before me,

JOHN GEST, Register.

The plaintiffs read the deposition of Dr. Joseph Klapp, which was in substance as follows:— That Peter Shade was under the medical care of deponent from the latter end of March to the 10th August 1837, when he died. At the close of one of his medical visits he was asked, he did not recollect by whom, to be a witness to Shade's will. Shade made the acknowledgments usual on such occasions, such as of his signature, his seal, and of the instrument submitted to be his last will, and deponent subscribed his name as a witness. The signature to the paper in dispute was deponent's signature. Thinks the other witness, Tittermary, was not present when deponent witnessed it. The will had been signed before deponent witnessed it. He handed it to Shade, who took it and acknowledged it to be his will.

On his cross-examination deponent stated he could not recollect how long before Shade's death the acknowledgment took place. The will was not read in deponent's presence, nor did he read it. To the best of his recollection the will was not subscribed at that time by the other witness. Deponent thinks he was the first witness to the will. To the best of his recollection, when he witnessed it there were two persons present besides the testator, viz: the testator's wife and Mr Murphy. Thinks these were all. Thinks he was in the presence of Shade, who was lying in bed, when first requested to witness the will. The will was then lying on a table or bureau, at the foot of the bed. Deponent subscribed

his name to it while it lay there. No one presented or handed it to him. Could not tell how or by whom his attention was called to it while it lay there. To the best of his recollection it was lying open. Could not say it was so when he entered the room. He did not come there at that time by appointment. Could not say how long he was in the room. To the best of his recollection he witnessed another will for Shade. It was impossible for him to recollect whether the will in dispute was the first or last will that he witnessed. Both the wills were witnessed by him during the course of his visits in Shade's last sickness. Could not say that the facts he had stated in relation to the acknowledgment of the will referred to the first one he witnessed, or the last one. Could not specify the time that elapsed between the execution of the first and last will. Supposed the period of time may not have been more than two or three weeks, and may have been less; it might have been some days, or one or two weeks; it could not have exceeded three weeks. Could not recollect the time that either will was executed. Neither of the wills was read to or by deponent. Did not recollect of the first will being produced when the last was subscribed. To the best of his recollection, the testator assigned some reason for making another will, the nature of which he did not recollect. Does not know wherein the first and last will differed, from any personal knowledge derived from seeing the wills or expressed by the testator.

The plaintiffs then gave in evidence the testimony of Dr Klapp given on a former trial (he having since died), in which he stated he paid his first visit to Shade on the 28th March 1837. It was after that time that he witnessed two wills of Shade. His impression was that it was not within a day or two that he witnessed the first will. Did not think there was a considerable interval between his witnessing the first and second wills. To the best of his recollection he was the first witness to the second will. It was between two and three weeks between the signing of the first and second wills. The interval did not exceed three weeks.

The plaintiffs then read the deposition of John V. Tittermary, as follows: — I am the person named as a witness to the will of Peter Shade, deceased, now exhibited to me (the paper in dispute). I did not see Shade subscribe his name to the said will. To the best of my knowledge, he acknowledged the signature to the will to be his. The will was shown to him in my presence; he spoke of it as his will, and acknowledged it to be his will. No person subscribed the will as a witness in my presence at the time I subscribed it. Dr Klapp was not in the room when I witnessed the will, but to the best of my knowledge Dr Klapp had subscribed the will as a witness before I did. To the best of my knowledge and belief, the testator, Shade, was of sound mind and memory when I subscribed my name as a witness to the said will. The testator, Shade, did not request me to put my name as a witness

[Jones v. Murphy.]

to the said will. I was requested in his presence and hearing by Mr Murphy, the executor, to witness the said will, and I did then immediately after put my name as a witness to the said will.

Cross-examined.—Mr Murphy, Mrs Shade, and an elderly lady whose name I do not remember, but who I think lives now with Mrs Shade, were present when I witnessed the will. It was on a Sunday in the day time, about noon, but whether before or after dinner I can't say. I was not in the habit of visiting Mr Shade, though I was well acquainted with him. The reason I went there that day, I was sent for, and told by Mrs Shade's black girl, that Mrs Shade had sent for me to come over there. I went over there. I had no conversation with Mr Shade about the will, nor did he converse with me about any matters at all. I only judge from Peter Shade's appearance on that day, that he was of sound mind and memory, for he did not converse that day with me about his will, or on any other day about his will. He was sitting up and appeared to look tolerably ill that day. He was bolstered up in the bed. To the best of my knowledge there was no fire in the room on that day, as it was a warm day. I saw him one other time while he was sick, but whether it was before or after I witnessed the will, I cannot now recollect. I don't think that Mr Shade was very deaf. I don't think that he was deaf. I don't recollect of having to speak loud to him : I refer now to the visit, and not to the time I was there to witness the will. At that visit I conversed with him, and saw nothing about him indicating want of sound mind.

Re-examined.—To the best of my knowledge I did not say anything to him when I went to witness the said will. I was in the room a very short time, and left there immediately after witnessing the will.

Cross-examined. — I think it was in July when I witnessed the will, but I am not certain. My memory is not good. I have never witnessed but one will there. I don't think any other persons were present when I witnessed the will, than those that I have named. I was sent over for by Mrs Shade's black girl. I think it was Mr Murphy who first mentioned to me that I was wanted to witness the will. Mrs Shade and a woman who lives in the house with Mrs Shade, were present when Mr Murphy spoke to me about witnessing the will. It was in Shade's room. There were no other papers exhibited at that time. Shade did not speak to any one further than to say that, when he was asked if the said will was his hand and seal, he said yes. The will was not read to him. I don't know that he was able to read at that time : he had not his spectacles on. I think he did not usually wear spectacles. I never saw him wear them. I don't think I was there more than five minutes. I teach school and was in a hurry to go to Sunday school. I am distinct in my recollection that Dr Klapp's name was there. I did not see the date of the will. I think Shade

[Jones v. Murphy.]

died in August. I received a notice to attend the funeral. 1 can't say how long it was after I witnessed the will, that Shade died. Murphy never spoke to me about the will until the time he asked me to witness it. He never spoke to me afterwards about it. None of the members of the family ever spoke to me about it. I don't think I ever stated that Dr Klapp was present when I witnessed the will, before the register or elsewhere. If I did, it was a mistake. Nothing was said about another will at the time I witnessed this will (the will in dispute). I think it was Mr Murphy who asked Mr Shade if that was his will. It was before I signed the will as a witness.

The plaintiffs then called Tittermary, who testified as follows :— This is my signature to the will dated 16th April 1837. I have reflected upon the matter since, and find that I was under a mistake in my deposition. I recollect that some time after that I called upon Mr M'Mullen to go with me to visit Mr Shade; from that, but not from that alone, I find I was under a mistake in my former testimony. I lived opposite Shade; he lived 41 and I lived 42. I could frequently hear him groan; from these circumstances Mr Shade lived upwards of three months after I signed that will. I am confident that it was either in June or July I paid the visit with Mr M'Mullen. Mr Shade died in August. It was on Sunday I witnessed the will; I was getting ready to go to Sabbath school; I recollect well the weather was warm. I was sent for to go over to Shade; I went over to the house, but did not go up stairs. This was before I signed the will. It was in cold weather; five or six weeks before. We had fire in our house that day. I was out when sent for the first time. I went over in the afternoon after I returned home.

Cross-examined.— I have been examined here three times; I have been examined about four times. I said on all those occasions but the last that it was in July. This was on the last time. After I had been examined the first time before a jury, I discovered the error. If I stated it after, I do not know how it was. I think, on the trial 11th of April I stated it was July. But I found I was mistaken. I do not know I can state I was mistaken except for the reasons above-mentioned. I recollect that it was two or three months after I signed the will I got M'Mullen to go with me. I think it was in July M'Mullen went with me. I have no memorandum by which I can fix that date. After I was examined before the first jury I found my mistake, but not after I was examined before the second jury. I think I mentioned that I was under a mistake when then examined. I do not remember having stated on the second trial that I called upon Shade on Sunday, having been sent for by a coloured girl. I have made no inquiry of any one about M'Mullen going with me. I think I was examined before Judge Randall, but do not say certainly. I was examined before Judge Jones and before Judge Parsons. It was

[Jones v. Murphy.]

previous to being examined before Judge Parsons I discovered my mistake. I have been turning over in my mind that it must be three months after I signed the will M'Mullen went with me; for three months after I signed the will I heard Shade groan. I did not mention this on a former trial. I cannot get at it in any other way but by reflection. M'Mullen lives in the city. We visited Shade on Sunday. I do not recollect I saw anybody but Mr and Mrs Shade. I have never seen M'Mullen since. I said nothing about M'Mullen or the groans of Shade on the last trial. I never thought of it before. I am sure that on some one of the trials I spoke of M'Mullen. My memory is not good. It is bad on some subjects. It is not bad on this subject, for I have been turning the matter in my mind, and feel sure I am not mistaken. I do not recollect of saying that the last time I saw Shade was when I witnessed the will. I never visited there with M'Mullen before the will. I do not recollect of stating as you have it down. I think Mr Shade died in August. I have reflected upon the matter, and I had a note to attend the funeral; it was dated in August. I do not recollect when it was the black girl called, but it was five or six weeks before I signed the will. I was told that the girl called. I recollect it was when we had fire in the stove; it was cold weather. I am not sure it was a month. I am sure it was more than a week before; it was in February or March. I went over, but did not see Shade; he was confined. Mrs Shade told me the will had been signed; I do not know how long Shade had been sick. It was more than a month before; it was the last time I saw him. I am not sure of the year. I might have stated before Judge Jones I had not seen him for three months. Mr Shade asked me to sign the will; it was in his room. I was not there more than five minutes; was in a hurry to go to Sunday school. Mr Murphy asked if it was his will. He asked if he acknowledged that to be his signature; he said it was. I asked him how he was; he said very poorly. I do not recollect of saying before, that I judged he was of disposing mind and memory by his looks. I was there to see him three times; the first time I did not see him. I went alone all but the last time; then M'Mullen went with me. I do not recollect saying that if I said M'Mullen went down with me after the will was signed, I was mistaken. I never saw any other, nor signed any other will of Peter Shade's.

The defendants offered to prove by Samuel Green, the regular and legal execution of a will, later in date and different in its contents and provisions, from that of 16th April 1837. That it took place a short time before the death of Peter Shade, and that it took place when he was unable to leave his bed. That such will passed immediately into the possession of these plaintiffs and Peter Shade's widow, by whom it had been fraudulently withheld or destroyed; that it was in point of fact and law a subsisting will at the death of the testator;—and to follow it by proof from other

[Jones v. Murphy.]

sources, of the contents of this will thus witnessed by Samuel Green and Dr Klapp. To this the plaintiffs objected on the ground that if proved it would not amount to a revocation of the will already proved; but the court overruled the objection and admitted the evidence.

Samuel Green, sworn.—I lived at the north-west corner of Almond and Front streets, in 1837, five or six doors from Mr Shade. I witnessed a will for Peter Shade. He sent his little coloured girl for me to come to his house; she said her master wanted to see me. I went; and Mrs Shade introduced me to Mr Shade's room. He asked if I would witness a will for him; he did not know how long he might live; he wished to have all his business fixed before he died. He told me then, that Dr Klapp and Mr Tittermary had witnessed a will before: the will was given to me, and he acknowledged it to be his will. I told him I had not been in the habit of witnessing wills, I did not know where I should put my name, there being no witness to the will. He said to his wife, Hannah, hand out the will witnessed by Dr Klapp, and which Mr Tittermary signed, and let Mr Green see where they signed it. This is like the will placed before me; there was no writing below their names. It is my impression this is the paper. I took the new will, and merely read a few lines, to satisfy me it was a will. I laid it on the table and put my name to it. There was no other witness to it. I think he said, let it lay on the table, I will get Dr Klapp to witness it. This was in the latter part of June or beginning of July 1837. I cannot tell how long it was before his death: not more than six weeks before it. I fix time by merely knowing it was summer, and my going to the country shortly after. I went to the country on Saturday before the big ship was launched at the Navy Yard. I was gone from Saturday till Monday. A very little time before this I went to the country. I went the next day after the ship launch. I was gone two weeks. When I returned, Mr Shade was alive. He died in about two weeks after I returned. I went with my own horse and wagon. I cannot say whether I bought the horse before or after I witnessed the will. This is the receipt for the purchase money of the horse, 17th of June 1837.

I was at work when I was sent for. I am positive that it was not earlier than June. He got hurt the same day I bought him. I cannot say whether it was before or after the accident I went to see Mr Shade. I do not recollect who brought to me the will I signed. She handed me out the second will. The old lady was rather slow. The wills I left on the table. Mr Shade was very low, hardly able to turn in the bed. From his appearance he did not seem able to turn himself in the bed. The trees were in leaf. When I went into the room my shirt-sleeves were rolled up. There was a gentleman sat opposite to me, his back was to the

south. He was dressed genteelly in black; a yellowish complexion. I have seen Mr Parkinson; he was not the man.

Cross-examined.—I swore in my deposition that Mr Shade said, leave it upon the table for Dr Klapp to sign. I think I said this on a former trial, but do not think I did in my deposition. I do not count much on my memory. I was in court when Dr Klapp died. I stated this before Dr Klapp died. I had no conversation with Mr Shade after I done my business. I said on a former time that Shade said, let it lay on the table; but do not recollect that I said it before Vogdes.

The plaintiff objected to this testimony on the ground that it did not come up to the offer made by the defendants, and that the witness did not prove the contents of the will; that this was not a revocation of the first will. The objection was then withdrawn for the present, to be renewed if the plaintiffs should desire it and the defendants failed to prove the contents of the will witnessed by Green.

Susan Green then testified as follows: I am the wife of Samuel Green. I know the black girl came for Mr Green. I did not know his business till he returned. I saw him go out of the house. I saw the girl. This was in warm weather. I think it was the last of June or early in July. We were preparing to go in the country. It was after the purchase of the horse, because the day Mr Green was sent for, he was preparing a poultice for the horse. The horse was hurt on the day he was bought. We owned no other horse. This is the horse with which we went to the country. I was at Shade's that day after my husband went. I spoke to Mr Shade. I found Mr Shade very low. I was informed in the morning he was very ill and helpless. I found his wife there. I asked him how he was; he said, very low. I visited him again. I found Mrs Jones there.

1. The defendants proposed to prove by this witness the conversation which took place between Mrs Jones and her father, and that a total reconciliation had taken place between her and her father at this time; and to be followed by testimony to show that the father had previously pledged himself in case his daughter returned certain property, to be entirely reconciled with her, and to divide his estate equally between her and his other children; or give her a child's portion under another will to be executed by him—and to show that the property thus referred to, was previously returned, and that a reconciliation had taken place between them, anterior to the will witnessed by Mr Green.

The plaintiffs objected to this testimony of the conversation of the deceased. 1. That this did not prove the contents of the will, nor had its execution yet been proved. 2. Nor did it prove a revocation of the first will already proved, under which the plaintiffs claimed. 3. That the proof of the contents, as now proposed, was not to be admitted; the declarations of the deceased were not

evidence, and not legal proof of its contents. The court overruled the offer, and rejected the conversation proposed to be proved by Mrs Green with the testator, as there contained, on the authority of *Lewis* v. *Lewis*, (2 *Watts & Serg.* 455) and *Clark* v. *Morton*, (5 *Rawle* 235) : and sealed an exception.

2. Wm. Nassau, Sen., was called by the defendants to prove, that for thirty or forty years he was acquainted with Mr Shade ; that he was a relation of his, and upon terms of familiarity with him ; that he visited him in the month of April 1837, at which time Mr Shade expressed his displeasure with his daughter, Mrs Jones, in relation to her retaining certain goods, and said if they were not returned he would cut her off. Mr Nassau prayed with him, and preached the mutual advantages of forgiveness, to those who expected to be forgiven hereafter. That afterwards he called upon Mr Shade, in May of the same year, after the execution of the will of the 16th of April, and at that time Peter Shade stated that his daughter Maria had been there and brought back the goods ; pointed to the mantel-piece, where some of the goods were; expressed himself satisfied with his daughter ; stated that she had begged his pardon, and acknowledged the reconciliation between them.

To this evidence the plaintiffs objected ; the court rejected it and the defendants excepted.

3. The defendants offered to prove by Elizabeth M'Gill that she was Mr Shade's sister's daughter; that she visited her uncle, Peter Shade, from the first of his sickness till his death; that while sitting by his bedside Mrs Jones came in, threw herself upon her father's bosom, and said, " My dear father, I ask your pardon if I have done any wrong—I ask your forgiveness." She was much agitated, and the tears ran from the old gentleman's eyes ; she sat a little while, got up, kissed her father, shook hands with him, and went away; he looked at her and said, " You bute," which witness understood a kind term for beauty; that previously there had been a coldness between them, and this, witness believed, was her first visit; she visited him several times afterwards. Witness saw her there herself three or four times, fanning him. There was an entire reconciliation, as witness thought. He appeared to be kind to her. Told witness the looking-glass and carpet had been sent back ; and he had previously told witness, that if she would bring back the goods he would make an *alteration*, and he would make her equal to his other children; he said that repeatedly. It must have been the 17th or 18th of May that Mrs Jones made her first visit; that time being fixed from the witness having buried a sister the day before.

To this evidence the plaintiffs objected, and the court rejected it and sealed an exception.

4. The defendants offered to prove by Elizabeth Cristman that she was the niece of Peter Shade deceased, and visited him fre-

[Jones v. Murphy.]

quently during his sickness, and frequently met Mrs Jones there after the 15th April 1837; that she found Mrs J. engaged in reading the Bible to her father; that she was upon good terms with her father from that time to the time of his death; that the witness had previously been spoken to by Mr Shade about Mrs Jones; that he stated if Mrs Jones would acknowledge her fault and return the goods, he would make her equal with the rest of his children; that witness saw the goods at testator's house during his illness; that Mr Shade told witness those were the articles Maria had sent home. This was the second Sabbath in July that he showed witness these things, and told her Maria had brought back the things. It was some time before Mrs Jones's first visit Mr Shade showed witness the things.

To this evidence the plaintiffs objected. The court rejected it and the defendants excepted.

5. The defendants offered to prove by Michael M'Gill that he knew Mr Shade, visited him during his last illness; saw Mrs Jones his daughter there, either in June, July or August 1837; saw her administer to her father; her attentions were received with kindness; no coldness between them; acted as parent and child should.

To this offer the plaintiffs objected. The court rejected it and the defendants excepted.

6. The defendants offered to prove by Mrs Susan Green that the day after the execution of the will witnessed by Mr Green, witness visited Mr Shade and met Mrs Jones there; that the deportment of Mr Shade and Mrs Jones was that of father and child; she had his hand in hers, and upon his saying he was very ill, she told him to put his trust in the Saviour; that Mrs Jones asked the witness to procure some wine and water, her father was so faint, for the purpose of bathing him. The witness told her she was a stranger, and Mrs Jones had better do it herself. Mrs Jones replied she had no communication with any of them but her father, and again asked the witness. That she made the application to the family and was insulted. That witness was there only twice; the day the will was witnessed by her husband and the day after.

To this evidence the plaintiffs objected. The court rejected it and sealed an exception.

7. The defendants called George N. Jones, grandson of the testator, to prove that the testator repeatedly said, that if the goods were returned by Mrs Jones he would make her equal with the rest of his children, and to prove that they were returned, and that there was entire reconciliation between the father and Mrs Jones. The witness saw the furniture in the house of Mr Shade about the middle of June.

To this offer the plaintiffs objected. The court rejected the evidence and sealed an exception.

8. The defendants offered to prove by Shade Jones, a grandson of the testator, that he, in the summer of 1837, had the goods

[Jones v. Murphy.]

returned to his grandfather in a car and otherwise, consisting of carpets, looking-glasses, tables and other things. That this was between the 15th of April and the time of Shade's death, or witnessing the will by Mr Green.

To this the plaintiffs objected. The court sustained the objection and the defendants excepted.

9. The defendants offered to prove by Frederick Boley that Mrs Jones was the favourite daughter of Mr Shade; also to prove that Mr Shade was a little deaf, and seventy years of age, or thereabout.

To this the plaintiffs objected. The court sustained the objection and sealed an exception.

10. The defendants offered to prove by Mrs Ferguson an entire reconciliation between Mrs Jones and her father; that testator treated Mrs Jones with more affection than he did the witness. This reconciliation was after the will of the 16th of April, and before the will witnessed by Green; and that he frequently told witness, if Maria would return him the goods, he would make her equal with his other children; that the other children had as many goods as Maria, and those which she got were returned.

The plaintiffs objected to the witness on the ground of interest, and showed a marriage article of agreement of the 18th April 1831; also that the testimony was not relevant. The court rejected the evidence and the defendants excepted.

The following was the agreement above referred to:

Articles of agreement indented, made, concluded and agreed upon this 18th April in the year 1831, between Peter Shade of the county of Philadelphia, gentleman, of the first part, Hannah Murphy of the said county, widow, of the second part, and Daniel R. Murphy of the city of Philadelphia, tinman, of the third part. Whereas a marriage is intended shortly to be had and solemnized between the said Peter Shade and the said Hannah Murphy, Now this agreement witnesseth that the said parties of the second and third part, for and in consideration of the sum of one dollar, lawful money of the United States, to them in hand well and truly paid by the said party of the first part, at or before the sealing and delivery of these presents (the receipt whereof is hereby acknowledged), have, for themselves, their heirs, executors and administrators, jointly and severally covenanted, promised and agreed to and with the said party of the first part, his heirs, executors, administrators and assigns, and by these presents do, for themselves, their heirs, executors and administrators, jointly and severally covenant, promise and agree to and with the said party of the first part, his heirs, executors, administrators and assigns, that she, the said party of the second part, shall not have, claim, challenge or demand any dower or third part of the estate of the said party of the first part. But that the estate of the said party of the first part shall be absolutely and entirely freed and discharged from all

and all manner of claim and claims of dower or thirds of the said party of the second part. But it is expressly understood that nothing herein contained shall prevent or debar the said party of the second part from taking and receiving any devise or bequest which the said party of the first part shall think proper to make to the said party of the second part, by any will now made, or which may hereafter be made by the said party of the first part. In witness whereof, &c.

| Sealed and delivered | PETER SHADE, | [SEAL.] |
| in the presence of | her | |
| JAMES J. BARCLAY. | HANNAH ⋈ MURPHY, | [SEAL.] |
| | mark. | |
| | DANIEL R. MURPHY, | [SEAL.] |

11. The defendants offered to prove by Joseph S. Riley the value of the property of Peter Shade at the time of his death; and that the will of the 16th of April 1837 was in the handwriting of Murphy, and to prove the place whence it was taken after Shade's death.

The plaintiffs objected to the first part of the offer, as to the value of the property of the testator. The court rejected that part, but suffered the defendants to prove in whose handwriting the will was, and also where it was found at the time of the testator's death. The defendants excepted.

Joseph S. Riley, sworn. I was present at the funeral of Peter Shade. I returned to the house after the funeral: the will was read by me. (The will shown.) This looks like it. The will was handed into my hands by Myers, the son-in-law of Mr Shade. Mr Murphy handed it to him. Mr Murphy took it from a secretary or bureau, from the east side of the room. I was on the north side of the room when I read it, and Murphy was on the south side. Other papers were taken out at the same time. I did not inspect any of the other papers; nothing but the will. Did not see what was done with the other papers. I did not see them pass out of the hands of Murphy. I cannot remember whether the drawer was locked or not. I do not recollect seeing any tin box. I never saw Murphy write.

It was admitted that the will was in the handwriting of Murphy.

Cross-examined.—Mr Myers requested me to read the will. Mr Murphy, Mrs Shade, Mr Ferguson, a son-in-law I do not know, all there. My wife, Mrs Sharpe, Mrs Rapp, Mr Blair.

Elizabeth M'Gill then testified that she was the niece of Peter Shade. The children that he had at the time of his death were Mrs Ferguson, Mrs Jones, and Mrs Myers. He had a daughter, Elizabeth, who died before her mother, and a son, John, who died before his father or mother, and left children. Shade had no children by his second wife.

The court below (PARSONS, J.) charged the jury as follows:—

VIII. — 37　　　z

[Jones v. Murphy.]

This is a feigned issue sent by the Orphans' Court to the Court of Common Pleas, to determine whether a paper writing dated the 16th April 1837, which has been read in evidence, is the last will and testament of Peter Shade deceased.   The cause turns entirely on a question of law to be decided by the court.   We shall submit no fact to you for adjudication, but will assume the responsibility of deciding the case upon principles of law which, *it is* believed, are settled by the Supreme Court.   There have been three pre-vious trials of this cause, and each verdict has been set aside by this court, the last one by me in the presence of the jury the mo-ment it was rendered.   I now desire a verdict rendered in accord-ance with the charge, in order that the court of last resort may judge of the correctness of my opinion.   On this trial I have re-jected nearly all the evidence offered by the defendants, so that the cause presents a different aspect from what it has done on any former trial, and leave no evidence to be weighed or considered by the jury.   Therefore we instruct you that this will has been proved according to the requisitions of the 6th section of the Act of 1st April 1833, which is, " That every will shall be in writing, and unless the person making the same shall be prevented by the extremity of his last sickness, shall be signed by him at the end thereof, or by some person in his presence and by his express di-rection ; and in all cases shall be proved by the oaths or affirma-tions of two or more competent witnesses, otherwise such will shall have no effect."   This will was signed by the testator, and is proved by two competent witnesses ; hence all the requirements of this section are answered.

The 13th section of the same Act to which I have referred, pro-vides, " That no will in writing concerning any real estate shall be repealed, or shall any devise or direction therein be altered otherwise than by some other will or codicil in writing, or other writing declaring the same, executed and proved in the same manner as is hereinbefore provided ; or by burning, cancelling, or obliterating or destroying the same by the testator himself, or some one in his presence and by his express direction."   And the 14th section makes the same provision respecting wills bequeath-ing personal property.

We instruct the jury that there is no evidence that Peter Shade altered this will by another will, or codicil in writing, or other writing declaring the same altered, by any paper executed and *proved* as is required by said act.   There is no evidence that this will was obliterated, cancelled or destroyed by the testator him-self, or by any one in his presence, or by his direction.   Such being the state of the case as presented before you, your verdict should be in favour of the plaintiffs.

It is contended by the defendants that they have proved by Samuel Green that there was another will executed by the de-ceased after the will of the 16th April 1837, already in evidence,

and that Dr Klapp has testified that he executed two wills, and therefore this will is revoked. But we instruct you, that all this evidence does not amount to a revocation of this will. In order to do it, they must prove that the provisions of the will subscribed by Green revoked that of the 16th of April, either in whole or in part; and if in part, in what particular. It is likewise contended by the defendants that Green has testified that when he signed the will as a witness, it was left on the table in the room of the deceased, who was so ill that he could not leave his bed; that testator's wife and another person were in the room; and that the same was abstracted from the possession of the deceased by fraud, or has been destroyed by some one interested in its destruction since the death of Peter Shade. But it must be borne in mind that no notice has been given to the plaintiffs to produce another will, so that they could answer on oath relative to their knowledge of the fact of any such being in existence at the time of the testator's death. Mrs Shade has not been called as a witness to testify as to her knowledge of the paper signed by Green, nor the individual who Green swears was in the room. Hence we instruct you that there is no evidence of fraud against the plaintiffs, of spoliation or destruction of this paper signed by Green, either by the plaintiffs or any one else. And if there had been evidence of these facts, it would be necessary to prove what the contents of the will alleged to be destroyed were, and to show that it was a revocation of this in whole or in part, and in what particular it revoked this will.

I consider the case of *Clark* v. *Morton,* (5 *Rawle* 235), rules this. So the case of *Lawson* v. *Morrison,* (2 *Dallas* 286). It was likewise decided in England, 150 years ago, relative to the will of Sir Henry Killgrew, reported in *Salkeld* 592, that when a second will had been made, and the contents were not proved to the jury, it was not a revocation of the former. At a later day the same question was before the English Judges in the case of *Goodright* v. *Harwood,* reported first in 3 *Wilson* 497, again in 2 *Black.* 937, and in *Cowper* 87, that a second will, unless the contents thereof be proved, is not a revocation of the former will; and one of the Judges assigned as a reason, for it may or may not be consistent with the former. How can it be known, in this case, that the so-called second will revoked the former, when no one. has appeared who ever saw it—when it has never been found or read by any person. It may or may not be consistent with the will now in evidence. Hence we instruct you that there is no evidence that this will has been revoked; and if you should believe all that Green has testified, your verdict cannot be in favour of the defendants.

The plaintiffs have submitted two questions of law, on which they ask the court to instruct the jury:

[Jones v. Murphy.]

**1.** That there is no evidence of a revocation of the will of the 16th April 1837.

This we answer in the affirmative, and say to the jury that there is no evidence of the revocation of this will.

**2.** That there is no evidence of fraud or spoliation of any subsequent will of Peter Shade, deceased.

This point we answer in the affirmative, and instruct you that there is no evidence of fraud, or of spoliation of any will made subsequent to this of the 16th April 1837; and if you believe all the evidence of Samuel Green, Dr Klapp and John V. Tittermary, and all the other evidence in the cause, there is no evidence of fraud, spoliation or destruction of any subsequent will by the plaintiffs, or legatees, or any one else, since the death of Peter Shade or before, unless he destroyed it himself.

It appears to the court that we have, in our general charge, and in answer to these points, decided the law of the case. But the defendants have submitted four propositions of law, on which they pray instruction to the jury, and we will proceed to answer each separately, as they have been presented.

**1.** That the issue in this case is, whether a paper writing, dated 16th April 1837, is the last will of Peter Shade.

The court say, this point is correctly stated; and it has been proved that this is the last will of Peter Shade, deceased; so we have already instructed you in our general charge.

**2.** That if the jury are satisfied that Peter Shade, after the 16th April 1837, regularly made and executed another and a different will, containing a different disposition, which he died without revoking, then the jury, upon the above issue, can find for the defendants.

If there were any facts on which to base this point, it would be correct. But we instruct you that there is no evidence that Peter Shade, after the 16th April 1837, regularly made and executed another and a different will, containing a different disposition, which he died without revoking; and we likewise instruct you that, upon the above issue, you cannot find for the defendants, because there is no evidence under the law of the land which would warrant this jury in rendering such a verdict.

**3.** That if the jury are satisfied from the evidence that a will was regularly made and executed by Peter Shade after the 16th April 1837, which contained a disposition of his property different from the alleged will of the 16th April 1837, and such last will of Peter Shade has been fraudulently withheld or destroyed without the consent of Peter Shade, then the jury, upon the above issue, can find for the defendants.

In reply to this proposition the court say that there is no evidence that Peter Shade, after the 16th April 1837, regularly made and executed another will, which contained a disposal of his property different from the alleged will of the 16th April 1837; nor

is there any evidence that such will has been fraudulently withheld or destroyed without the consent of Peter Shade. Nor can the jury, on the above issue, find for the defendants; hence we refuse to give the instruction prayed for.

4. That it is the right of the jury to decide, under the evidence, whether a will later in execution and date than the 16th April 1837 has been so withheld or destroyed.

The court answer this point in the negative, because there is no evidence on which the jury can act. When there is any evidence of such facts, it is the province of the jury to decide them. But when there are no facts to submit to a jury upon a proposition of law presented to the court, we have no right to leave them for their decision. There is no evidence before us that a will of Peter Shade, later in date than that of the 16th of April 1837 has been withheld or destroyed by any one, or destroyed by anybody but the testator.

I have desired to answer every question fully, and have taken the whole cause from the jury in my general charge, and decided it as a question of law to be determined by the court alone, and refuse to give the instruction prayed for in the fourth point. And in conclusion I say, that even if the jury believe the *whole evidence* in the cause to be true, their verdict should be in favour of the plaintiffs. The evidence in the case is to be made a part of the record.

The defendants excepted to the charge.

The defendants assigned for error the rejection of the evidence in the bills of exception, and also the following errors in the charge.

1. The court erred in instructing the jury, that the case turned entirely upon a question of law.

2. In assuming the responsibility of deciding the case, and withdrawing the facts from the jury, when there were facts upon which the jury were legally entitled to decide, and upon which three former juries had decided in favour of the defendants.

3. In instructing the jury, that there is no evidence that Peter Shade altered the will (will in issue) by another will or codicil in writing, or other writing declaring the same altered, by any paper executed and proved according to law.

4. In directing the jury to find a verdict for the plaintiffs.

5. In instructing the jury unfavourably to the defendants on the ground that the defendants had given no notice to the plaintiff to produce the will alleged by defendants to be the last will of Peter Shade, so that the plaintiffs could answer on oath relative to their knowledge of the fact of any such being in existence at the time of testator's death; and that Mrs Shade had not been called as a witness to testify as to her knowledge of the paper signed by Green; nor the individual who Green swears was in the room. Hence the court instructed the jury that there was no evidence of fraud against the plaintiffs, or of spoliation or destruc-

tion of the paper signed by Green either by plaintiffs or anybody else.

6. In further charging the jury that if there had been evidence of these facts, (the facts last above referred to,) it would be necessary for defendants to prove what the contents of the will alleged to be destroyed were, and to show that such will was a revocation in whole or in part, and in what particular, of such will.

7. In instructing the jury upon the 1st point of the plaintiffs, that there was no evidence of the revocation of the will of the 16th of April 1837.

8. In instructing the jury in relation to the 2d point of plaintiffs, that there was no evidence of fraud or spoliation of any subsequent will of Peter Shade, deceased.

9. In their answers to the 2d, 3d, and 4th points of the defendants.

*D. P. Brown* and *B. Tilghman*, for the plaintiffs in error, referred to 1 *Bay* 464; 5 *Rawle* 235; 2 *Watts & Serg.* 455; 16 *Serg. & Rawle* 84; 2 *Binn.* 416.

*J. M. Read* and *Meredith*, contra, cited Act 8th April 1833, (*Par. & Johns.* 466); 1 *Dall.* 258; 2 *Ibid.* 286; 6 *Serg. & Rawle* 47, 452, 215, 489; 3 *Yeates* 511; 16 *Serg. & Rawle* 87; 6 *Wend.* 173, 181; 2 *Binn.* 406; *Roberts on Wills* 261, 265; 3 *Wils.* 497; 2 *Bl. R.* 937; *Cowp.* 87; 7 *Bro. Parl. Cas.* 344; 2 *East* 488; 4 *Kent. Com.* 528; 14 *Mass.* 208; 1 *Pick.* 535; 4 *Burr.* 2512; 2 *Whart.* 582.

The opinion of the Court was delivered by

ROGERS, J.—This is a feigned issue to try the validity of a certain instrument of writing dated the 16th April 1837, purporting to be the last will and testament of Peter Shade, deceased.

The defendants deny it to be his last will, because they aver that the testator after that date, viz. on or about the 17th June 1837, made another will, different in its dispositions, revoking all former wills, and that said will was destroyed, or suppressed by fraud. If the defendants can substantiate the truth of this statement, the paper writing of the 16th April cannot be admitted to probate; and whether there was a subsequent instrument containing different and inconsistent dispositions from the former will, or a clause revoking all former wills, are the great questions in the cause.

Before entering into a particular examination of the case, I wish to premise that the point is not whether the evidence was sufficiently strong to establish the making of a will subsequent to the 16th April, but (from the course which the court below have thought right to pursue) it is whether there was evidence given or withheld proper to be submitted to the jury for their decision.

It is enacted in the Act of the 8th April 1833, 6th section, that every will shall be in writing, and unless the person making the same shall be prevented by the extremity of his last sickness, shall be signed by him at the end thereof, or by some person in his presence, and by his express directions; and in all cases shall be proved by the oaths or affirmations of two or more competent witnesses, otherwise such will shall have no effect.

The 13th section provides that no will in writing concerning real estate shall be repealed, nor shall any devise or direction therein be altered otherwise than by some other will or codicil in writing declaring the same, executed and proved in the same manner as is hereinbefore provided; or by burning, cancelling, or obliterating or destroying the same by the testator himself, or by some one in his presence and by his express direction.  And the 14th section makes the same provision respecting wills bequeathing personal property.

It is not alleged that the testator cancelled, obliterated or destroyed the first will.  The defence rests on the first clause of the 13th section of the Act.  In the construction of that clause it is conceded that an instrument purporting to be a last will and testament, must have the same attestation, &c. to operate as a revocation, as is requisite to give it validity as a will.  But although a will must be proved regularly by two witnesses, yet circumstances may supply the want of one witness, when they go directly to the immediate act of disposition.  *Eyster* v. *Young*, (3 *Yeates* 511); *Reynolds* v. *Reynolds*, (16 *Serg. & Rawle* 87); *Miller* v. *Carothers*, (6 *Serg. & Rawle* 215).  It has also been ruled (and with these principles, as will be hereafter seen, we do not interfere) that the contents of such second will must in general be found, and the contents so found must appear to be inconsistent with the dispositions of the former will, to operate as a revocation; and that if part is inconsistent and part is consistent, the first will shall only be revoked *pro tanto*, and to the extent of these discordant dispositions.  3 *Wilson* 497; *Cowp.* 87; 7 *Bro. P. C.* 344.  But it is not necessary (as I conceive) where the will is destroyed, and especially where it is suppressed or destroyed by fraud, to prove the precise facts in which the latter will so set up as a revocation of a former will differs from it.  For if the jury find expressly, or infer from circumstances (which I shall show hereafter they may), that the dispositions made by the second will are inconsistent with the dispositions in the former, that is a sufficient ground to decide the latter will a revocation.  And this seems to be the opinion of Mr Powell, in his *Treatise on Devises, p.* 519.

In conformity to the principles above stated, the plaintiff having given the ordinary proof of the execution of the first will, it is incumbent on the defendant, to sustain his case, to prove to the satisfaction of the jury the factum of a subsequent will, and that it was suppressed or destroyed by fraud.  These preliminary points

[Jones v. Murphy.]

being satisfactorily established, an inference will arise, as will be hereafter shown, that the first instrument was repealed or altered; and consequently the latter is a revocation of the former.

The points above indicated are the natural order in which the case should be viewed, for, it will be observed, if the defendants fail in sustaining either of the two first propositions, the third, which is a corollary from them, cannot arise.

1. As to the factum of a will subsequent in date to the writing of the 16th April 1837. It is admitted that a revoking will must be in writing, that it must be attested by two witnesses, or by one witness accompanied by proof of circumstances which go directly to the immediate act of disposition; and the first question to which the attention of the court and jury must be directed, is, have these indispensable requisites of the Act been complied with? If the jury find against the defendants on this point, further inquiry is needless. And the first thing which strikes the mind is, that no person can examine the testimony without coming to the conclusion that the testator made two, and but two wills, one on the 16th April 1837, the other a short time before or after that date. This is put beyond the possibility of doubt by the concurring testimony of Dr Klapp and Samuel Green, one a witness for the plaintiffs, the other for the defendants. The only conceivable difficulty which can arise is, whether the instrument which it is sought to set up as a revoking will, be subsequent or prior in date to the 16th April; and next, whether the witnesses refer to one and the same instrument of writing. Without stopping to inquire whether when a will is regularly attested one witness may prove its contents or the date of it, where the date becomes material, here we cannot fail to observe there are two witnesses, with a variety of circumstances to confirm their statements, who depose that the writing in question was executed on or about the 17th June 1837, and, of course, subsequent to the will now in issue. For on this part of the case the jury will pay great attention to the testimony of Samuel Green and Susan Green, corroborated, as they unquestionably are, by strong and cogent motives which the testator had after the execution of his first will to make a different disposition of his property. The testimony (and I refer as well to the testimony rejected as that which was received) discloses this case. The testator, aged 70 years, lying helpless in bed in the extremity of sickness, believing he had serious cause of displeasure against a young and favourite child, on the 16th April 1837, some three or four months before his death, made his last will and testament, containing a devise to his second wife and to her daughter, who was a stranger to his blood, and also this item: "I consider that Maria Jones (his daughter by a former wife) has had her full share of my said estate in moneys improperly taken, moneys loaned, and property improperly taken." That a misapprehension of improper conduct by his child was the operating cause of this

singular, and, may I not add, unparental clause, appears not only from the will itself, but from repeated declarations of the testator. For the defendants offered to prove that he repeatedly expressed his displeasure with his daughter, in relation, as the witness says, to her return of certain goods, saying, if they were not returned he would cut her off. It also appears that subsequently to the signing of the first will, a complete reconciliation took place between father and child, in pursuance of his repeated pledges to that effect, she having returned the property which was the cause of the father's displeasure. This testimony adds great weight to the evidence of Green and wife on the point of time, for it suggests motives of the most powerful kind, operating with irresistible force on the heart of a parent, for an entire alteration in the previous disposition of his property. The testator's estate was worth say $40,000, to be divided into five shares; consequently Maria's portion, on a fair and just division, would amount to $8000; whereas by the will as it stood at the time she had regained the affections of her aged parent, she gets nothing. He bequeathed, it is true, to each of her five children the comparatively pitiful sums of $200. To repair this glaring injustice, we may reasonably presume, was one, among other reasons, for an alteration in his will. It renders the allegation that a subsequent will was made by the testator a most probable event. Indeed, a contrary supposition comports but little with the ordinary conduct of parents placed in similar circumstances.

But another reason suggests itself equally cogent. The will of the 16th April contains an imputation of dishonesty in his own child, a direct charge of embezzlement and fraud. In the full flow of returning affection, he must naturally be anxious to prevent so disgraceful a charge from going on the records of the county. This is a conclusion from which no parent will dissent, and it may account for the fact that he preferred executing a new will rather than making the necessary alteration by means of a codicil. In the one case he gets rid of an odious imputation; in the other he perpetuates it. But it is said there is some conflict in the testimony of Dr Klapp and Green and wife; but it will be for the jury to say whether this is not more fanciful than real. The only thing of which Dr Klapp appears to have been certain was, that he witnessed two wills. After having proved the first will, he says, " To the best of my recollection I witnessed another will. It is impossible for me to recollect whether the will hereto annexed (meaning the will of the 16th April) marked (A), is the first or last will. Both wills were witnessed by me during the course of my visits in his last sickness. Of course I cannot say that the facts I have stated in relation to the acknowledgment of the will refer to the first one I witnessed or the last one. I cannot specify the time that elapsed between the execution of the first and last will. I should suppose that the period of time may not

VIII.—38

[Jones v. Murphy.]

have been more than two or three weeks, and it may have been less." Under the facts here disclosed, it will be for the jury to say what weight ought to be attached to this supposed discrepancy. It will be remembered that there is nothing more difficult to recollect than dates; and perhaps the jury may be inclined to rely more on the memory of Samuel and Susan Green than Dr. Klapp, as the former have something in aid of *their* recollection, whereas the latter has literally nothing. Besides, the precise date, except for purposes of identification, is totally immaterial; as the only matter of any consequence is whether the revoking will is subsequent in time to the execution of the instrument of writing offered for probate.

We will now notice the next subdivision of the factum of a subsequent will; that is to say, we will next inquire whether Dr Klapp and Samuel Green refer to the same instrument. It appears that the testator, at periods of time not far distant from each other, executed two wills, and we have not the least reason to believe he made more than two wills. Dr Klapp was a witness to two wills, and Samuel Green was a witness to one will. From this we arrive at the conclusion that as Dr Klapp was a witness to both wills, one in conjunction with John V. Tittermary, the will of 16th April, and there were but two wills, and Mr Green was a witness to one will only, they must have attested the same instrument. There was no other writing to which Dr Klapp could be a witness except the one attested by Green. Dr Klapp says neither of the wills was read over to him. He has no recollection of the first will being produced when the last was subscribed. He then adds, the testator, to the best of his recollection, assigned some reason for the making another will, the nature of which he does not recollect. This part of the testimony bears not only on this point, but the time of the factum of the revoking will; for the inquiry is pertinent, what motive could he have had so probable as that he felt it a duty to alter the unjust and unequal provisions of the will of the 16th April, obliterating, as far as he could, the cruel and as he was afterwards no doubt convinced unfounded aspersions on the character of an unoffending, or at any rate repentant child. A difference is also suggested in this, that Green states he was the first witness to the will of the 17th June, whereas Dr Klapp says, to the best of his recollection, he was the first witness to the second will, drawing an argument from this against the identity of the instrument. To this it may be replied that Dr Klapp testifies he cannot say that the facts stated by him in relation to the acknowledgment of the will refer to the *first* or the last will. By this it appears how confused and imperfect is his memory, confounding the one instrument with the other. Besides, it is not altogether improbable that this impression may be produced by a mistake as to the instrument; for, in truth, he was the first witness to the will of the 16th April. For these reasons we are of

[Jones v. Murphy.]

the opinion there was evidence of the factum of a will subsequent in date to the will offered for probate; and consequently there was error in withdrawing this part of the case from the decision of the jury.

The factum of the will being established, another question, necessary to the defence, presents itself. Was the will so made destroyed or suppressed by fraud? This, which is peculiarly a question of fact, presupposes that a will was made by the testator after the date of the first will. The next inquiry then is, was the second will cancelled by the testator himself, or by some person in his presence and by his express direction? or was it destroyed or has it been suppressed by others, without his privity and consent? In the investigation of this point the first and most natural inquiry is, to whose custody and control was the paper committed? It is idle to say it was in the actual custody of the testator. The condition of his health and all the testimony are in opposition to this idea. It is in proof the first will, in which, be it remembered, Mrs Shade is a devisee, and her brother, Daniel R. Murphy, one of the executors, was in the possession of Mrs Shade or Daniel R. Murphy, or of both; and the jury will have the right, under the facts disclosed, to infer that the subsequent paper was committed to her care also. I do not say they are bound to make this inference, but they may infer it without doing any violence to the probabilities of the case. If a subsequent devise was made, and that, with the first, went into the custody of Mrs Shade or Mr Murphy, the next and most natural inquiry will be, what has become of it? One of two things must have taken place. It was either cancelled by the testator, which he had an undoubted right to do, or it has been suppressed or destroyed by those to whose custody it was committed. The jury must choose between the one or the other of these alternatives. It is an undeniable principle, that while a will is in the possession of the testator, the presumption is that it has been cancelled by himself. But was this paper in the possession of the testator? Practically it was not, for the evidence shows it was under the control and in the power of the wife, or of his executor.

But is it probable it was destroyed by the testator himself, or in his presence and by his express directions? If it was, how easy to have proof of it! The absence of such proof is an argument against it. Besides, the very reasons which have been assigned for making a second will are those which make it so difficult to believe that he could have been induced to cancel it. The very supposition is a gross libel on his parental feelings, as there is no evidence, but directly the reverse, that anything afterwards occurred to alienate his affections from his erring but repentant child. He died, as is shown, in her arms. For these reasons and others which may be suggested, the jury may be of the opinion it was neither destroyed by him nor by his orders, or with his con-

[Jones v. Murphy.]

sent. If not cancelled by the testator, and there are strong grounds for believing it was not, we have but the other alternative, that it was destroyed or has been suppressed by those to whose custody it was committed, and whose interest it may have been to destroy it. If two wills have been traced into the lion's den, it will be for the jury to say why it is but one came out of it. It is true, fraud is not presumed. It, however, does not require direct or positive proof. It may, and often is, inferred with great certainty from attending circumstances.

From the remarks which have been made, it will appear that we entirely differ from the court in their positive instruction given to the jury, that there is no evidence of fraud or spoliation, either as against the plaintiff or any one else. Without undertaking to express an opinion on the weight of it, we think there is testimony which should be submitted to the jury, and of which they alone are the legitimate judges.

But the court further instruct the jury, that if there had been evidence of these facts, that is, the factum of a subsequent will, and its destruction or spoliation by any person other than the testator himself, it would still be necessary to prove what the contents of the will alleged to be destroyed were, and to show that it was a revocation of this, in whole or in part, and in what particular it revokes this will. For this position the court relies on *Morton* v. *Clark*, (5 *Rawle* 235); *Lawson* v. *Morrison*, (2 *Dall.* 286); *Sir Henry Killgrew's Case*, (*Salk.* 592); and *Goodright* v. *Harwood*, (3 *Wils.* 497, 2 *Black.* 937, and *Cowp.* 87).

It is not denied that in the ordinary case of a disposing will lost or destroyed, and where there is no allegation of fraud, in addition to proof of the factum of the will, it is requisite to prove its contents; and this from necessity, for it is obvious it cannot operate as a disposition of the property without proof of its contents. So, if the instrument which was intended to be a will and not merely a revocation, cannot operate as a will, it cannot, as appears from all the authorities, take effect as a revocation. But even this doctrine must be taken with some qualification; for a will, though rendered inoperative by extrinsic circumstances, may revoke a former will. Thus, if properly executed and attested to pass freehold lands according to the statute of Cha. 2, though it should be prevented from operating by the incapacity of the devisee or any other matter *dehors* the will, the former will is nevertheless revoked by it. So a will devising lands in fee to the heir at law, though void as to the purpose of a will, yet operates as a revocation if attested according to the statute. 1 *Vez. Jun.* 17; *Ellis* v. *Smith*, (8 *Vez. Jun.* 370); 4 *Roll. Af.* 615; 1 *Roberts on Wills* 199. With much more reason is it that where a will is rendered inoperative as a will by the fraud of a person interested in its destruction, it will nevertheless operate as a revocation. It is better, surely, that a person should die intestate, than that a

[Jones v. Murphy.]

spoliator should be rewarded for his villany. So, in *Harwood* v. *Goodright*, (*Cowp.* 87, 3 *Wils.* 497); 7 *Brow. P. C.* 344, it is ruled that a subsequent will, though it be found to contain a different disposition from a former, if the particulars of that difference be unknown, is no revocation of such former will. These principles are all granted; but I have looked into the cases on this head, and in none of them was there proof of spoliation. In truth, many of them go on the legal presumption that the subsequent will was cancelled by the testator himself; and it is not denied that a former will is not revoked by a subsequent will afterwards cancelled by the testator. In none of these did the controlling principle of this case arise; for where there is evidence of spoliation, I deny that it is necessary to give express proof in what particulars the two wills differ or that there are inconsistent dispositions, to produce a revocation, thereby causing an intestacy. A contrary inference is plainly deducible from the cases cited by the court itself. It was evidently the opinion of the judges who ruled the case of *Harwood* v. *Goodright*, that if the jury had found a spoliation of the paper, it would have altered the case. Thus Lord MANSFIELD, in *Harwood* v. *Goodright*, (1 *Cowp.* 91), intimates that where there is spoliation the jury may presume inconsistent dispositions. Thus, he says, the jury might have had evidence to prove an inconsistent disposition, or circumstances to lay a fair foundation for presuming it to be so, *as spoliation, or the like.* But as no such circumstance appeared, the court ruled it was not a revocation. Had the defendant destroyed the second will, the judgment of the court in *Harwood* v. *Goodright*, we have reason to believe, would have been different. For Lord MANSFIELD, after stating the rule that a subsequent devise of lands must be inconsistent with a former devise of the same land, or the first will would stand as a good subsisting devise, observed, that it was not found that the second will was, in any particular, repugnant to or inconsistent with the first. Had the defendant destroyed the second will, he observes, there might have been good ground to presume such inconsistency or repugnancy, and the jury might have found the fact of revocation. And to the same effect are the remarks of Chancellor WALWORTH, in *Betts* v. *Jackson*, (6 *Wend.* 180). He observes, even when the exact contents of a will cannot be ascertained, if it has been suppressed or destroyed by a person interested in opposition thereto, the court or jury, *in odium spoliatoris*, will be authorized to presume many things as against the party who has been guilty of the fraudulent act.

If, therefore, on another trial the jury should find the factum of a subsequent will, and that this will was destroyed or withheld by fraud, they may, and, as I conceive, are bound to infer that the second will contained inconsistent dispositions with the first; nay more, *in odium spoliatoris*, that the second will contained a clause expressly revoking all former wills. In point of law it must be

[Jones v. Murphy.]

regarded as a will subsisting at the death of the testator, so as to operate as a revocation of all former devises. It is far better that there should be an intestacy than that a spoliator should be rewarded for his dishonesty. It is absurd to require strict proof of the contents of a will, so as to operate as a revocation, where it appears that it has been destroyed by fraud. From the great anxiety which testators frequently feel to conceal the disposition of their estates, it would, in a majority of cases, be impossible to prove their exact contents.

In conclusion, I have to remark that I have examined the several bills of exception, and it seems to me that in every case the evidence ought to have been received. The evidence rejected by the court has a bearing more or less direct on the factum of the revoking will, as well as the imputed fraud in its destruction. On the whole case we are of the opinion the facts were improperly withdrawn from the jury, and that the judgment must be reversed and a *venire de novo* awarded.

Judgment reversed, and *venire de novo* awarded.