J-A25042-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ESTATE OF SHIRLEY MARIA CAVALLO, DECEASED | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: PILAR CAVALLO-CAMPISI | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1369 EDA 2024 |

Appeal from the Order Entered April 2, 2024
In the Court of Common Pleas of Northampton County
Orphans' Court at No(s):  4820-1200

BEFORE:  OLSON, J., DUBOW, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:                    **FILED JUNE 27, 2025**

Pilar Cavallo-Campisi ("Pilar") appeals from the order denying her petition for citation sur appeal, which sought to revoke the probated will of Shirley Maria Cavallo ("Shirley") based on a subsequent will.  We affirm.

We summarize the factual and procedural history of this appeal from the record.  Shirley had been married, and she and her husband had five children: Pilar, Brondo G. Cavallo ("Brondo"), Jeannine Cavallo-Altemose ("Jeannine"), Marisa Cavallo ("Marisa"), and Jonathan Cavallo ("Jonathan"), all now adults. **See** N.T., 10/23/23, at 30.  Shirley's husband died in 1991. **See id**. at 115.

In 2010, Shirley engaged Theresa Hogan, Esq. ("Attorney Hogan") to update her will. **See** N.T., 10/24/23, at 16-17.  Attorney Hogan knew Shirley as a friend and previously did legal work for Shirley. **See id**. at 15.  Attorney Hogan described Shirley as "astute" in her profession as a restaurant owner, her relationships, and in other issues involving estate planning. **Id**. at 19.

Shirley regularly engaged professional help with her business matters. *See id*. Attorney Hogan met with Shirley, and Shirley stated she wanted to give Brondo all of her assets. *See id*. at 20-23. Shirley expressed love for all her children; however, while her other children had made livings for themselves, Brondo remained dedicated to the restaurant, and Shirley and Brondo were essentially "partners in life and in the business" because they lived and worked together. *Id*. at 23, 30, 48-49.

In 2011, Attorney Hogan prepared a self-proving will naming Brondo as executor and sole beneficiary of Shirley's estate, and Shirley signed the will along with two witnesses ("the 2011 will"). *See id*. at 25-27. Shirley instructed Attorney Hogan to keep the 2011 will in a safe and told Attorney Hogan not to give her copies because they could cause problems in the family if someone else saw them. *See id*. at 28-29; *see also id*. at 24 (noting Attorney Hogan's testimony that Shirley "knew that her other children would be upset" by the 2011 will). Additionally, Attorney Hogan prepared a power of attorney naming Brondo as Shirley's attorney in fact.[1]

In 2018, Shirley suffered a stroke, and Pilar filed an action seeking to appoint herself as Shirley's guardian ("guardianship action"). *See id*. at 32-34. Shirley retained Attorney Hogan to defend against Pilar's guardianship

_____

[1] The 2011 will and the power of attorney respectively designated Pilar as Shirley's substitute executor and attorney in fact in the event Brondo was unwilling or unable to serve. *See* Ex. R-10; N.T., 10/24/23, at 24-25. Additionally, the 2011 will designated Brondo's siblings as beneficiaries if Brondo died before, or within thirty days after, Shirley's death. *See* Ex. R-10; N.T., 10/24/23, at 74.

action, at which time Attorney Hogan reviewed the 2011 will with Shirley. *See id*. at 34-41. Shirley reaffirmed the 2011 will and did not mention anything to Attorney Hogan about a subsequent will. *See id*. at 41. Shirley was able to understand the guardianship action and was upset about the in-fighting between Brondo and his siblings. *See id*. at 35-36.[2]

Shirley died in 2020, and Attorney Hogan presented the 2011 will for probate. *See id*. at 42-44. Shirley's children reached out to Attorney Hogan about Shirley's estate, although none mentioned a subsequent will, or objected to the probate of the 2011 will. *See id*. Pilar did not contact Attorney Hogan to mention a subsequent will, because, as Pilar explained, she had "had enough" of Attorney Hogan after she defended against Pilar's attempt to be appointed as Shirley's guardian. N.T., 10/23/23, at 61. The register of wills admitted the 2011 will into probate and issued letters testamentary to Brondo in September 2020. Nearly one year later, and one day before the time for

---

[2] Pilar stated that after Shirley's stroke, Brondo began blocking her and her siblings' access to Shirley, changed the locks to the restaurant and home, and either refused to allow her to visit Shirley alone or recorded her visits with Shirley. *See* N.T., 10/23/23, at 46-48. She added Brondo was not caring for Shirley properly after her stroke, was verbally abusive to Shirley, and he would disparage his siblings in front of Shirley. *See id*. at 95-96. Jonathan, Jeannine, and Marisa similarly testified Brondo blocked their access to Shirley and they had concerns about how Brondo treated Shirley. *See id*. at 105-112, 152-54, 175-78. We add that Pilar had informally requested better access to Shirley during the guardianship action. *See* N.T., 10/24/23, at 36-37; Ex. R-14. Attorney Hogan testified Shirley refused the requests. *See* N.T., 10/24/23, at 37. Pilar did not pursue the guardianship action further because she ran out of money to pay lawyers. *See* N.T., 10/23/23, at 99.

so doing ended, Pilar filed a notice of intention to appeal and a petition for a citation sur appeal ("petition") challenging the probate of the 2011 will.

In her petition, Pilar averred, for the first time, that she and Shirley had created a subsequent will in 2014 ("the 2014 will"); Shirley had signed a copy of the 2014 will before a notary public, Stacey Kircher ("Kircher"); and Brondo subsequently had possession of the signed 2014 will, which he must have destroyed. Pilar cited **Jones v. Murphy**, 8 Watts & Serg. 275 (Pa. 1844), to support her claims that the 2014 will was valid and revoked the 2011 will. **See** Pilar's Mem. of Law in Opp'n to Brondo's Dispositive Mot. to Dismiss, 9/8/22, unpaginated at 8.

The matter proceeded to a trial before the orphans' court. Pilar did not produce a signed copy of the 2014 will or any direct evidence that Shirley signed the 2014 will. However, Pilar testified she recently found an undated and unsigned draft copy of the 2014 will and described how she and Shirley created the 2014 will. **See** N.T., 10/23/23, at 30-35, 63-64; **see also** Ex. P-2.[3] Specifically, Pilar testified she previously used "LegalZoom"[4] to prepare a

_____

[3] Pilar testified she initially believed she had a signed copy of the 2014 will, but then stated she was not sure if her copy had been signed. **See** N.T., 10/23/23, at 59. After filing the petition, Pilar found the draft 2014 will in a storage box, after a flood in her basement. **See** N.T., 10/23/23, at 32. The certified record does not contain the draft 2014 will. Although a copy appears in the reproduced record, that copy is incomplete. The parties, however, did discuss the contents of the draft 2014 will on the record during trial.

[4] "LegalZoom offers the creation of basic legal documents such as incorporation papers, simple wills, uncontested divorces, and trademark
*(Footnote Continued Next Page)*

will for herself or her daughter Norway Campisi ("Norway"), and, when Shirley learned of Pilar's self-prepared will, Shirley asked Pilar to draft Shirley's will in order to save money. **See** N.T., 10/23/23, at 30-31, 63-64, 91. Shirley told Pilar that Pilar should be executrix, and all of Shirley's children were to have an equal share in her estate, but Brondo should continue to run the restaurant. **See id**. at 67. Pilar stated she used the LegalZoom will as a template to type the 2014 will. **See id**. at 30-31, 67. Shirley reviewed and approved the draft copy of the 2014 will, despite the fact the draft contained provisions that did not make sense or did not align with the wishes Shirley expressed to Pilar. **See id**. at 67-78.[5] Pilar testified that she and Shirley laughed when they read a part of the 2014 will they did not understand. **See id**. at 69-73

Pilar further testified that on April 18, 2014, she, Norway, Brondo, and Shirley went to Kircher's notary public office for Shirley to sign the 2014 will.

---

registration. Using an online questionnaire, customers can build 'an effective legal document' step-by-step, generally in under fifteen minutes." Catherine J. Lanctot, Does LegalZoom Have First Amendment Rights?: Some Thoughts About Freedom of Speech and the Unauthorized Practice of Law, 20 Temp. Pol. & Civ. Rts. L. Rev. 255, 257 (2011).

[5] As noted by the orphans' court, the draft 2014 will: (1) did not contain a provision for Brondo to run the restaurant; (2) named Pilar as a remainder beneficiary with a 100% share; (3) discussed a testamentary trust, a qualified subchapter S trust, and named Pilar as guardian of Shirley's children, despite the fact they were all adults. **See** Order, 4/2/24, at 4. Additionally, while Pilar believed she had created a section for witnesses to sign that section was not included in the draft 2014 will.

*See id*. at 36-39.[6] Pilar briefly went into the office beforehand to take care of a personal matter, but she then left the office and waited in her car. Shirley arrived with Brondo, and Shirley and Brondo went inside the office. *See id*. When Shirley and Brondo left the office, they drove back to the restaurant, while Pilar and Norway drove back separately and met them at the restaurant. *See id*. at 39. Pilar testified that she saw Brondo with a folder marked, "Will," and he put the folder in a cabinet in the restaurant. *See id*. at 41. Pilar testified the cabinet had a lock, and "[p]robably Brondo or [Shirley]" only had the keys. *See id*.

Kircher testified in Pilar's case-in-chief and provided her journal of notarial activities ("journal"), which contained the following entry: "4/18/14, Shirley M. Cavallo, Will." *See id*. at 9-10, 12; *see also* Exhibit P-1.[7] Kircher stated the entry indicated she would have verified Shirley's identity and

_____

[6] There is no indication that Shirley had done business with Kircher before; however, Pilar did business at Kircher's office about once a year since 1997. *See* N.T., 10/23/23, at 18.

[7] At the time of the entry in 2014, the Notary Public Law required a notary public to keep and maintain a register or journal of all official acts by the notary. *See* 57 P.S. § 161(a) (subsequently amended and recodified at 57 Pa.C.S.A. § 319, effective 2017). Section 161(a) required the notary's register "contain the date of the act, the character of the act, and the date and parties to the instrument, and the amount of fee collected for the service." 57 P.S. § 161(a). Section 161(c) provided that the "register is the exclusive property of the notary public, may not be used by any other person and may not be surrendered to any employer of the notary upon termination of employment." 57 P.S. § 161(c). The current version of the statute requires an entry to contain more information, including statements regarding how the notary identified a person. *See* 57 Pa.C.S.A. § 319(c)(4)-(5).

witnessed Shirley sign a will. *See* N.T. 10/23/23, at 14-16. Kircher had no independent recollection of meeting Shirley, Shirley signing a will, or the contents of the document. *See id*. at 19. Kircher acknowledged that her daughter, Taylor Kircher ("Taylor"), who had died before trial, wrote the entry in the journal. *See id*. at 12-13. Kircher testified Taylor would have been standing next to Kircher and would have made the entry as Shirley signed. *See id*.

Pilar's daughter Norway testified that she was outside when Shirley and Brondo went into Kircher's office on April 18, 2014. *See id*. at 128. Norway stated she saw Brondo later that day at the restaurant. Brondo was holding a folder marked, "Will," that contained a document bearing a seal, and Brondo put the folder in a cabinet in the restaurant. *See id*. at 128-32. Another of Brondo's sisters, Jeannine, testified she saw a folder marked, "Will," in the cabinet, which Jeannine described as a place where Shirley would keep "important things that couldn't get lost." *Id*. at 148. Pilar also testified she subsequently asked Brondo to see the 2014 will, but Brondo just laughed at her. *See id*. at 43.

Brondo testified at trial and denied seeing a 2014 will. *See id*. at 240. Brondo contradicted Pilar's and Norway's accounts about the signing of the 2014 will on April 18, 2014. Brondo noted that April 18, 2014, had been the Good Friday holiday, a particularly busy time at the restaurant. *See id*. at 196-97 (indicating Shirley would have been preparing "hot cross buns"), 235. Brondo testified Shirley would not have left the restaurant to conduct other

business, and Shirley generally took care of her other business matters on Mondays and Tuesdays when the restaurant was closed. ***See id***. He also stated the cabinet Pilar, Norway, and Jeannine referred to would not have been in the restaurant in 2014. ***See id***. at 197.

Attorney Hogan testified during Brondo's case-in-chief. She described the circumstances surrounding Shirley's execution of the 2011 will and the subsequent interactions she had with Shirley prior to her death, including the defense of Pilar's guardianship petition in 2018, and other casual encounters. ***See*** N.T., 10/24/23, at 16-40. Attorney Hogan emphasized that Shirley did not mention a subsequent will or any intent to revoke or change the terms of the 2011 will during those interactions. ***See id***. at 40-41. On cross-examination, Pilar's counsel emphasized Attorney Hogan, during the guardianship action, recorded a note that Shirley indicated "circumstances have changed," but she was "not prepared to remove her other children from her estate planning documents." ***See id***. at 72-81. Pilar's counsel highlighted the possibility Attorney Hogan's note meant Shirley had intended to, or created, a subsequent will calling for all of her children to obtain equal shares of her estate. ***See id***. Attorney Hogan, however, stated the note referred to the possibility of removing Shirley's other children as alternate beneficiaries if Brondo died, as well as Pilar's role as a substitute attorney in fact. ***See id***. at 74-75.

Following the submission of post-trial memorandums, the orphans' court entered an order, wherein it concluded Pilar failed to prove the 2014 will was

valid or Brondo's fraudulent destruction or suppression of the 2014 will. ***See***

Order, 4/2/24, at 8-11. Additionally, the court determined that while Pilar

presented a draft copy of the 2014 will, "the remainder of [her] testimony

[was] not persuasive[,]" particularly, with respect to the creation of the

document in 2014. ***Id***. at 3. The court further stated the entry in Kircher's

journal was "not reliable and [was] insufficient to consider the alleged 2014

will as valid" because Taylor, not Kircher, recorded the entry in the journal,

which, the court indicated, was a violation of the Notary Public Law. ***Id***. at 5-

6, 9. Pilar timely appealed, and both she and the orphans' court complied

with Pa.R.A.P. 1925.

Pilar raises the following seventeen issues on appeal:

1. Did the lower court commit a clear error of law wherein the court failed to apply and follow the prevailing Supreme Court precedent as set forth in ***Jones*** . . ., as said case is not distinguishable from the instant matter and should be controlling?

2. Did the lower court commit numerous abuses of discretion by . . . not accepting the testimony of . . . Kircher, a notary, in terms of proof that the 2014 will existed despite irregularities in the method of recordation?

3. Did the lower court err as a matter of law in not applying ***Eyster v. Younq***, 3 Yeates, 511 (Pa. 1803); ***Reynolds v. Reynolds***, 16 Serg. & Rawle 82 (Pa. 1827); and ***Miller v. Carothers***, 6 Serg. & Rawle 215 (Pa. 1820), in failing to determine that[,] where only one witness is available to establish the decedent's execution of a will[,] circumstances allow the will to be proven in accordance with the statute?

4. Did the lower court commit an abuse of discretion in not finding under the totality of facts that the 2014 will was valid and did revoke the 2011 will?

5. Did the lower court commit an error of law in relying only upon the "two witness rule" in strictly applying the statute with regard to the 2014 will?

6. Did the lower court commit an abuse of discretion in not finding that the will was signed when same was documented in a notary log as a witnessed signature despite any irregularities in the recording, there is no possible evidentiary explanation for the entry being in the logbook except for the appearance of [Shirley] with the 2014 will in the notary's office?

7. Did the lower court commit an abuse of discretion in finding that "all witnesses at the trial testified that they did not witness [Shirley] sign the alleged 2014 will," in that, there is no question that . . . Kircher, the notary, had to have seen the signatures since she did notarize a document entitled will, which could not have been the 2011 will, based upon the entirety of the testimony?

8. Did the lower court commit an abuse of discretion finding that the notary public's journal entry was "not reliable," because the entry was made by someone being supervised directly by the notary public?

9. Did the lower court commit an error of law in interpreting the [former] Notary Public [L]aw . . . to find that this notary log was "used by any other person," which was improper and a misapplication of this statute, and which was critical to the findings of fact below constitutes both an abuse of discretion and an error of law?

10. Did the lower court commit an error of law and abuse of discretion in that the court found that the absence of the lack of an independent recollection of the notarial act which occurred on April 18, 2014, by the notary public rendered the notary public's journal entry unreliable and insufficient to consider the 2014 will as valid?

11. Did the lower court commit an error of law and abuse of discretion in that the court dismissed the testimony of the notary public as to her standard procedure for identifying individuals appearing before her, which was to obtain their driver's license, and that there were no circumstances under which she would not have obtained their identification?

12. Did the lower court commit an error of law in concluding that the notary public's journal entry was not reliable in this matter to

- 10 -

establish the existence of the 2014 will is based upon improper statutory construction of the Notary Public [Law]?

13. Is the lower court's finding that there is no evidence of fraudulent suppression a complete abuse of discretion and against the totality of the evidence in the case?

14. Did the lower court commit an abuse of discretion and a clear factual error in finding that Attorney Hogan had any "credibility with respect to [Shirley's] capacity"; to the contrary, Attorney Hogan admitted clearly that she had no idea what the testamentary intent of [Shirley] was from 2012 through 2018, a critical period concerning the alleged 2014 will?

15. Did the lower court commit an abuse of discretion in not finding that the 2014 will existed and was in the possession of Brondo . . .?

16. Did the lower court commit a grievous abuse of discretion and error of law in considering whether or not criminal charges would or could be lodged against Brondo . . . for destruction of a recordable instrument with intent to deceive or injure?

17. Did the lower court commit an abuse of discretion against the totality of the evidence in this matter?

Pilar's Br. at 5-11 (some capitalization omitted). Pilar's argument section of her brief does not correspond to the order of her statement of questions involved in this appeal. We, like Pilar, condense our discussion of the seventeen issues into the following overlapping three claims: (1) whether the orphans' court erred when it concluded the 2014 will was invalid; (2) whether the orphans' court erred when it rejected Kircher's testimony, and the entry in her journal, as proof that a signed version of the 2014 will existed; and (3) whether the orphans' court abused its discretion in refusing to find that Brondo fraudulently suppressed the 2014 will. *See id*. at ii-iv. As these claims all

relate to Pilar's assertion that **Jones** is controlling, we will address them together.

The following principles govern our review in an appeal from an orphans' court's determinations:

> [T]he hearing judge determines the credibility of the witnesses. The record is to be reviewed in the light most favorable to appellee, and review is to be limited to determining whether the . . . court's findings of fact were based upon legally competent and sufficient evidence and whether there is an error of law or abuse of discretion. Only where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence may the court's findings be set aside.

**In re Estate of Brumbaugh**, 170 A.3d 541, 544 (Pa. Super. 2017) (internal citation and indentations omitted). Where an issue raises a question of law, this Court's standard of review is *de novo*, and the scope of our review is plenary. **See In re Estate of Tscherneff**, 203 A.3d 1020, 1024 (Pa. Super. 2019).

To the revoke an existing will, the Probate, Estates, and Fiduciaries ("PEF") Code requires a subsequent will or codicil, another writing executed and proved in a manner required of wills, or an express act (*i.e.*, the destruction of the prior will by the testator or at the testator's express direction). **See** 20 Pa.C.S.A. § 2505.[8] To be valid, the subsequent will or writing must be in writing and signed or marked by the testator or, under certain circumstances, signed by another. **See** 20 Pa.C.S.A. § 2502. All wills,

_____

[8] Pilar does not dispute the validity of the 2011 will.

including "lost" wills, must be proven by the oaths or affirmations of two competent witnesses. *See* 20 Pa.C.S.A. § 3132; *In re Estate of Wilner*, 142 A.3d 796, 802, 805-06 (Pa. 2016).

When the testator retained custody of an original copy of a subsequent will, and the original copy cannot be found after the testator's death, a presumption arises the testator either revoked or destroyed the will. *See In re Estate of Janosky*, 827 A.2d 512, 520 (Pa. Super. 2003); *accord In re Estate of Felix*, 304 A.3d 780, 2023 WL 5527957 (Pa. Super. Aug. 28, 2023) (unpublished mem. decision at *5); Pa.R.A.P. 126(b). To overcome this presumption, the party holding a copy of the will must provide positive, clear, and satisfactory evidence that: (1) the testator duly and properly executed the original will; (2) the contents of the original will were substantially as they appeared on the copy of the will presented; and (3) the testator had not destroyed or revoked the will before the testator died. *See Janosky*, 827 A.2d at 519-20.

As it is relevant to Pilar's arguments, we further note that in the nineteenth century decision in *Jones*, our Supreme Court outlined the principles of a challenge to a probated written will based on an alleged subsequent will that the challenging party could not produce at trial due to fraud. In *Jones*, the Court noted the party contesting the probated will bears the burden of proving "the factum of a subsequent will, and that it was suppressed or destroyed by fraud." *Jones*, 8 Watts & Serg. at 295. The *Jones* Court concluded the trial court there erred when it excluded evidence

the testator had executed a subsequent will after reconciling with his daughter and by instructing the jury in accordance with its evidentiary ruling. *See id*. at 296-300. The *Jones* Court further reasoned the finder of fact could have inferred the parties with interests in the prior will had exclusive possession of the subsequent will and destroyed the subsequent will because its terms were adverse to their interests. *See id*. at 295-96, 300-01. Thus, the *Jones* Court concluded, if the jury credited the excluded evidence, it could have found the subsequent will existed but was fraudulently destroyed or suppressed, and those findings would sustain a further inference that the subsequent will revoked the prior will. *See id*. at 301-02.

When addressing the first step in this analysis—*i.e.*, the "factum" that a subsequent will existed—the *Jones* Court noted the possibility that there was only one witness to establish the validity of the subsequent will. *See id*. at 295, 297-98. The *Jones* Court concluded that while the law generally requires proving a will by two witnesses, circumstances could permit proving the subsequent will by one witness. *See id*. at 295 ("But although a will must be proved regularly by two witnesses, yet circumstances may supply the want of one witness, when they go directly to the immediate act of disposition") (internal citations omitted).

In the present appeal, Pilar first claims the orphans' court erred when concluding the 2014 will was invalid. *See* Pilar's Brief at 23-33. She contends that the court improperly relied on the two witness rule concerning Shirley's signing of the 2014 will. *See id*. at 23-24. Pilar notes Kircher, the notary,

testified, based on the "4/18/14, Shirley M. Cavallo, Will" entry in her journal, that Shirley must have signed the 2014 will before Kircher and Taylor, Kircher's daughter who died before trial. *See id*. at 24. Pilar contends that Kircher constituted "one complete witness" to Shirley's signing of the 2014 will, and there were circumstances excusing the need for a second witness. *Id*. at 25-26. Specifically, Pilar reviews her trial evidence in a light most favorable to herself—*i.e.*, that Brondo had possession of the signed and notarized 2014 will, then excluded other family members from contacting Shirley, and, therefore, must have destroyed the copy of the signed 2014 will, which would have been adverse to his interests under the 2011 will. *See id*. Pilar concludes these circumstances, similar to *Jones*, supplied "the want of one witness" and established the validity of the 2014 will, its fraudulent destruction or suppression, and the revocation of the 2011 will. *See id*. at 23-27, 30-33.

Next, Pilar claims the orphans' court abused its discretion in finding Kircher's journal was "not reliable" because Taylor wrote the entry in the journal. *Id*. at 39. Pilar asserts that nothing in the Notary Public Law either prohibited Kircher from directing her daughter Taylor, who was not a notary at the time, to record an entry in the journal or required the recording of any more information than the journal contained. *See id*. at 37-39. Pilar further claims that as a business record of Kircher's notarial activity, the entry in the journal established the fact that Kircher witnessed and notarized Shirley's signature on a subsequent will. *See id*. at 41-43. Pilar thus concludes that

- 15 -

the orphans' court should have found Shirley appeared before Kircher, and any suggestion that Shirley did not sign the 2014 will was premised on misapplications of law. *See id*. at 33-34.

In her third claim, Pilar asserts the orphans' court abused its discretion when determining Brondo did not destroy or suppress the 2014 will. Pilar asserts she presented ample evidence, which the court ignored, establishing Brondo would have had control over the 2014 will after Shirley's stroke in 2018. *See id*. at 47-49. Pilar faults the orphans' court for refusing to find Brondo guilty of a crime of destroying documents while suggesting Kircher violated laws concerning the entry in the journal. *See id*. at 49. Pilar insists *Jones* is indistinguishable from the present case, and the trial evidence here, at a minimum, showed Shirley, like the testator in *Jones*, changed her testamentary intent at some point after executing her prior will. *See id*. at 52-54.

> The orphans' court, in its findings of fact, stated:
>
> [Pilar] did not produce a valid subsequent will. The alleged subsequent will drafted in 2014 is not a signed and witnessed original instrument. It is a copy of a draft, which is not signed, dated, or witnessed.
>
> [Pilar] prepared the alleged 2014 will from a template she obtained from LegalZoom and identified [E]xhibit P2 as an unsigned copy of the alleged 2014 will that she drafted. *The [court] finds that the remainder of [Pilar's] testimony is not persuasive*. [Pilar] testified that [Shirley] spontaneously asked her to prepare a new will for her in 2014, even though she had completed estate planning with an experienced attorney just

three years before. . . .[9] [Pilar] attributed her earlier inability to find the unsigned copy due to a flood in her basement, and "being busy"; however, the flood cleanup receipt indicates that the flood did not occur until September of 2021.

[Pilar] testified that [Shirley] discussed how she wanted the alleged 2014 will drafted and indicated she wanted "everything to stay the same" regarding equal shares and [Brondo] continuing to run the restaurant. Notably, there is no provision in the alleged 2014 will for [Brondo] to run the restaurant. [Pilar] further testified that [Shirley] reviewed the draft of the alleged 2014 will and approved it, despite the fact that page two oddly identifies the remainder beneficiary as [Pilar] with a total share of 100%. [Pilar] acknowledges that she did not understand this provision. She declined to answer whether [Shirley] approved this part, saying only "she just looked over it."

When asked about the testamentary trust provision on page three of the alleged 2014 will, [Pilar] again testified that she did not understand that provision either, but that [Shirley] reviewed and approved it. When asked about the qualified subchapter [S] trust provision on page five of the alleged 2014 will, [Pilar] testified that she "wanted to take it out", and that both she and the [Shirley] laughed about it and neither of them understood what it meant. When asked about the provision in the alleged 2014 will appointing [Pilar] as the "guardian of the persons" of her siblings, even though they were adults, [Pilar] again said that she and [Shirley] laughed about it, did not understand it, but [Shirley] approved the alleged 2014 will nevertheless.

Although [Pilar] testified in a deposition that she had prepared the alleged 2014 will with witness signatures, but could not recall who they were, the alleged 2014 unexecuted copy contains no signature lines for witnesses. [Pilar] further testified that [Shirley], an astute and engaged business woman, reviewed the alleged 2014 will, approved its contents, and signed it despite these odd - illogical provisions.

A notary public, . . . Kircher, has an entry in her 2014 notary journal, which reads "4/18/14, Shirley M. Cavallo, Will." For the

_____

9 The orphans' court stated that Pilar had made a copy of the signed 2014 will, which she could no longer find. *See* Order, 4/2/23, at 3. However, it does not appear that Pilar so testified. Rather, Pilar testified she believed she had a signed copy of the 2014 will, which she could not locate.

following reasons, we conclude that the notary public's journal is not reliable. [Shirley's] handwriting is not in the journal. The journal entry is not in the notary public's handwriting. Rather, Taylor[, Kircher's] daughter, since deceased, made the journal entry. Taylor . . . was not a licensed notary public at the time of the entry. [Kircher] admitted that she regularly violated the notarial law by allowing someone other than herself to make entries.

There are no witnesses to [Shirley] signing the alleged 2014 will. [Kircher] has no independent recollection of any notarial act occurring on April 18, 2014. She has no recollection if anyone was with [Shirley]. [Kircher] has no knowledge of the contents of any document referenced by the one line in her notary journal and knows of no copies.

[Kircher] knew [Pilar] personally as she had been a regular customer of her office since 1997. The notary public did not know [Shirley], [Brondo,] or the other Cavallo siblings personally. She does not know what [Shirley] looked like and had no ability to identify her by personal knowledge. Although the notary public testified that it was her practice to ask for a driver's license in the absence of personally knowing the individual, there is no indication in the notary journal that a driver's license was obtained.

[Pilar] did not witness [Shirley] sign the alleged 2014 will. Norway . . . did not witness [Shirley] sign the alleged 2014 will. Jeannine . . . did not see [Shirley] sign the alleged 2014 will. Marisa . . . did not see [Shirley] sign the alleged 2014 will. [Brondo] did not witness [Shirley] sign the alleged 2014 will. Those who knew of an alleged 2014 will learned about it from [Pilar].

April 18, 2014, was Good Friday. Good Friday would have been a busy day at [Shirley's] restaurant and not a day that [Shirley] would leave the restaurant to conduct business elsewhere. Such tasks were usually performed on Mondays or Tuesdays when the restaurant was closed.

Order, 4/2/23, at 3-6 (record citations omitted) (emphasis added).

In the discussion section of its order, the court concluded that "[t]he alleged 2014 will [was] not valid because it was not signed[,] nor proven by the oath or affirmations of two competent witnesses." *Id*. at 8. The court

determined that none of the witnesses at trial saw Shirley sign the 2014 will and reiterated the entry in Kircher's journal was unreliable because it was in Kircher's daughter's handwriting, not Kircher's. *Id*. at 9. The court, when considering Pilar's claim of fraudulent destruction or suppression, again concluded Pilar's testimony was "not persuasive" and refused to rely on speculation to revoke the 2011 will and accuse Brondo of destroying a recordable instrument with the intent to deceive or injure, a crime pursuant to 18 Pa.C.S.A. § 4103. *Id*. at 10. The court distinguished ***Jones*** by noting ***Jones*** involved different circumstances, specifically: there had been no dispute about the existence of two wills in ***Jones***; the evidence in ***Jones*** would have shown a marked change in circumstances impacting the prior will, *i.e.* the testator and his daughter's reconciliation; and the evidence placed the subsequent will under the control of the testator's primary beneficiary in his prior will while the testator, unlike Shirley, was near death. ***See id***. at 10-11.

Following our review, we conclude Pilar's arguments do not merit relief. To the extent Pilar asserts ***Jones*** is dispositive of the question of the existence of a valid 2014 will, we disagree. Nothing in the ***Jones*** decision compelled the orphans' court here to conclude the 2014 will existed and was valid. The ***Jones*** decision rested on the trial court's improper exclusion of evidence that would have allowed the jury to infer the testator revoked the probated will disinheriting his daughter because the testator and his daughter reconciled shortly before his death. ***See Jones***, 8 Watts & Serg. at 296-99. Additionally, ***Jones*** repeatedly emphasized it remained for the jury to decide whether the

testator had a subsequent will destroyed or whether the beneficiaries of the prior will destroyed the will fraudulently. ***See id***. at 299 (reasoning that "[o]ne of two things must have taken place. It was either cancelled by the testator, which he had an undoubted right to do, or it has been suppressed or destroyed by those to whose custody it was committed. ***The jury must choose between the one or the other of these alternatives***") (emphasis added). Thus, ***Jones*** did not conclude circumstantial evidence would, as a matter of law, prove the "factum" of a subsequent will revoking a prior will; rather, the Court determined ***it was for a finder of fact*** to weigh the evidence, including the evidence excluded by the trial court in that case. ***See id***. at 294, 298, 300, 302.

Here, the orphans' court, sitting as finder of fact, considered all evidence presented as to the existence of the 2014 will, including Pilar's testimony about creating the 2014 will, the undated and unsigned draft of the 2014 will, and Kircher's testimony about the entry in her journal. The court's determination that Pilar's testimony was unpersuasive is supported by competent evidence. Shirley was an astute businessperson who would enlist professional support and who, in fact, retained Attorney Hogan to draft the 2011 will. ***See*** N.T., 10/24/23, at 15-23. Moreover, we cannot conclude the court's refusal to accept Pilar's testimony—namely, that only three years later, in 2014, Shirley would have asked Pilar to draft a subsequent will using a template from LegalZoom, simply laughed off portions of the draft she did not understand, and ratified portions of the draft that were clearly inconsistent

with the directions she gave Pilar—constituted a capricious disbelief of the evidence requiring reversal. **See Brumbaugh**, 170 A.3d at 544 (noting that only where it appears from a review of the record there was a capricious disbelief of evidence may the court's findings be set aside).

Furthermore, the orphans' court, as finder of fact, was entitled to afford greater weight to Brondo's claim that Shirley would not have left the restaurant to notarize the will on April 18, 2014 over Pilar's claim that Shirley must have properly executed the 2014 will based on Kircher's journal. **See** Order, 4/2/23, at 5-6; N.T. 10/23/23, at 196-97, 235. As the orphans' court's findings have support in the record, we will not disturb them on appeal. **See Brumbaugh**, 170 A.3d at 544.[10]

Lastly, on the issue of fraudulent destruction or suppression of the 2014 will, **Jones** instructs that without proof of the "factum" of a subsequent will, a further analysis is unnecessary. **Jones**, 8 Watts & Serg. at 296 (noting that if the finder of fact decides against the challenging party on the existence and validity of a subsequent will, then no further inquiry is required). In light of Pilar's failure to convince the orphans' court that the 2014 will existed and was properly executed, we need not address the issue of spoliation. **See id**.

In any event, having reviewed the record, we discern no basis to conclude that Pilar's evidence was so compelling as to require a reversal. In

---

[10] For these reasons, we need not delve into Pilar's legal argument that the Notary Public Law did not prohibit Kircher from directing Taylor to record an entry in Kircher's register or otherwise required information that the orphans' court found lacking.

the present case, the sole evidence of a changed testamentary intent after the execution of the 2011 will was Pilar's testimony, which as discussed above, the orphans' court found "unpersuasive." Notably, Shirley made no mention of the 2014 will or a desire to change the 2011 will to Attorney Hogan. *See* N.T., 10/24/23, at 40-41.[11] This stands in marked contrast to the improperly excluded evidence in *Jones*, wherein several witnesses would have testified to the reconciliation between the testator and his previously disinherited daughter and the resolution of the issue that led to the disinheritance. *See Jones*, 8 Watts & Serg. at 297. Moreover, as noted by the orphans' court, there was no indication that Brondo had exclusive possession of the 2014 will, even had it been proven, and the will would have remained accessible to Shirley even assuming Brondo had locked it in the cabinet in the restaurant in April 2014. *See* Order, 4/2/24, at 10-11. Under these circumstances, we discern no abuse of discretion in the orphans' court's refusal to infer fraudulent destruction or concealment.

---

[11] We note Pilar's emphasis on Attorney Hogan's note indicating Shirley told her circumstances changed, but Shirley did not want to remove the other siblings from estate planning documents. *See* Pilar's Br. at 53-54. However, the orphans' court was free to reject Pilar's suggestion this meant Shirley wanted all of her children to have an equal share, particularly since Attorney Hogan testified her note referred to Pilar's designation as an alternate executrix under the 2011 will and an alternate attorney in fact in the power of attorney. *See* N.T., 10/23/23, at 72-76.

In sum, we agree with the orphans' court that Pilar failed to establish her claims that a 2014 will existed, was valid, and revoked the 2011 will, and we affirm the order denying Pilar's petition sur appeal.[12]

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/27/2025

---

[12] Similarly, because Pilar did not carry her burden of establishing Shirley duly and properly executed an original copy of the 2014 will, the contents of the draft 2014 will and the originally signed copy were substantially similar, and Shirley had not destroyed the 2014 will, her claim that a lost subsequent will revoked the 2011 will must fail. **See generally Janosky**, 827 A.2d at 519-20; **In re Estate of Keiser**, 560 A.2d 148, 150 (Pa. Super. 1989).